**IN THE UNITED STATES DISTRICT COURT**
**FOR THE NORTHERN DISTRICT OF MISSISSIPPI**
**DELTA DIVISION**

CLARENCE BENNETT, JR.,                                                    **PETITIONER**

v.                                               **CIVIL ACTION NO.:  2:11cv236-MPM-JMV**

RONALD KING, ET AL.,                                                    **RESPONDENTS**

**MEMORANDUM OPINION AND ORDER**

Petitioner Clarence Bennett, Jr., Mississippi prisoner no. 34527, has filed a federal habeas

petition pursuant to 28 U.S.C. § 2254 challenging his State court convictions for aggravated

assault and possession of a firearm by a convicted felon.  Having considered the submissions of

the parties, the State court record, and the law applicable to Petitioner's claims, the Court finds

that the petition should be denied.

**Background Facts and Procedural History**

On April 6, 2005, Petitioner was arrested for disturbing the peace at his apartment

complex, the East Side Manor Apartments, in Cleveland, Mississippi.  Officers from the

Cleveland Police Department were dispatched to the apartment complex after receiving a call

that the occupant of apartment number fourteen was creating a disturbance.  Petitioner lived in

apartment number fourteen.  Petitioner had gotten into a disagreement with Myron Hall, who

lived in apartment number twelve in the same complex with his girlfriend, Tonya Lewis, and

Lewis' son and daughter.  The argument between the two men involved Petitioner's annoyance

that Lewis had previously called the landlord and reported that Petitioner's truck was broken

down, which resulted in Petitioner either having to move the truck and/or have it towed.  The

police arrived and spoke to an irate Petitioner, who told the officers about the truck and complained that Lewis would not have called the landlord if she knew how to parallel park. After the responding police officer could not calm Petitioner, he was arrested for disturbing the peace. He was released on bond shortly thereafter. About an hour later, police officers were again called to the East Side Manor Apartments to investigate a report of shots being fired.

Robert Graham, an investigator with the Cleveland Police Department, testified that he responded to a report of a shooting at the East Side Manor Apartments on April 6, 2005, and that several officers were present when he arrived. Myron Hall had been shot. Graham stated that after speaking to the victim, Petitioner was developed as a suspect. Officers found a nine millimeter handgun and a holster inside of Petitioner's apartment, and a nine millimeter shell casing was found outside the door of Petitioner's apartment. Hall was taken away by an ambulance for medical treatment; Petitioner was placed in a squad car.

Graham testified that he gave Petitioner his *Miranda* rights, and that Petitioner admitted to shooting Hall, alleging that he shot at Hall twice because Hall ran at Petitioner while armed with a pocket knife. Petitioner also told Graham that there had been a disagreement between Hall and himself earlier in the day, and he told Graham about Lewis, the landlord, and his vehicle. Petitioner told Graham that he had been arrested as a result of the earlier altercation with Hall, and that he had made bond and returned to his apartment when the second incident, which resulted in the shooting, occurred. Petitioner admitted that he had purchased the gun used in the shooting approximately two months prior to the incident.

Tonya Lewis testified that Petitioner was always "picking with" her, because Petitioner thought she had called someone in order to get Petitioner to move his truck. She stated that when

Petitioner was asked to move his truck, he became annoyed and responded by insulting her and her inability to parallel park. Lewis testified that Petitioner had approached on the day of the shooting "fussing" about his parking spot, and that Hall intervened to stop Petitioner, who went back in his apartment. She then called the police, who subsequently arrested Petitioner.

Lewis stated that she, Hall, and the children left their apartment for a short time after Petitioner was arrested, and that when they returned, she noticed Petitioner standing in his doorway. She stated that she and her son went inside, while Hall and her daughter went to get the children's book bags out of the car. Lewis testified that she heard talking and two or three gunshots before Hall came in the apartment and said that he had been shot. She called the police again.

Lewis testified that Hall did not possess a weapon, except for a razor that he used to cut hair. She maintained that the razor was inside a bag in their apartment at the time Hall was shot, however. She stated that Hall did not have a weapon at the time he was shot, nor did he have a weapon when he spoke to Petitioner earlier that day.

Officer Stanley Ray "Bo" Brewer testified that he was one of the first officers dispatched to the East Side Manor Apartments on the afternoon of the shooting. Brewer stated that he was aware at the time he arrived that the police department had already been to the complex earlier in the day to deal with a situation involving Petitioner. Brewer testified that once he arrived at the apartment complex, there were several people standing around that reported that Hall had been shot, and that the person who shot Hall was in apartment number fourteen. Brewer and Officer Rhett Nelson went to apartment number fourteen. Brewer testified that upon their approach to the apartment, he noticed a shell casing on the ground near Petitioner's door, which suggested to

him that Petitioner might have a weapon. Once the officers announced themselves and Petitioner opened the door to his apartment, the officers pulled Petitioner outside and handcuffed him. The officers looked around the apartment to see if anyone else was present. While doing so, they saw a gun holster. Brewer testified that a gun was found during a later search of the apartment.

Myron Hall testified that on April 6, 2005, he heard Petitioner and Lewis arguing outside of his apartment, and that he went outside to help his girlfriend. Hall testified that Petitioner was upset with Lewis, because he blamed Lewis for his truck having been towed. He stated that he ran after Petitioner, who ran into his own apartment. Hall testified that he was not armed with a weapon at the time. Later that same day, he and Lewis were returning to the apartment with Lewis' children, after having picked up the children from school. Hall testified that Petitioner stuck his head outside of his door and said, "If you see that tall man again, tell him I got something for him." Hall responded, "Tell the man I got something right here." Hall stated that he was standing close to his own door when Petitioner then stepped outside of his apartment and pulled out a gun. Hall testified that he turned to run into his apartment, and that Petitioner fired several shots at him. Hall stated that he was not armed at the time. Hall suffered a graze wound to his back, for which he received medical treatment and was released.

Bobby Riley, who lived in apartment number twenty of the East Side Manor Apartments, testified that she knew Hall and Lewis, and that while she did not know Petitioner's name, she knew him upon sight. She testified that she heard loud talking outside of her apartment on the day of the shooting. She stated that she saw Hall, she heard two gunshots, and then she saw Hall run into his apartment. She testified that she did not see anything in Hall's hand, and that he was standing by his car when the argument began. She did not see who fired the shots.

Officer Rhett Nelson testified that he was dispatched to East Side Manor Apartments earlier on the day of the shooting, and that he was told upon arrival that the occupant of apartment number fourteen had been cursing and causing trouble. Nelson testified that he knocked on the door of apartment number fourteen, and that Petitioner, irate and showing signs of intoxication, opened the door. Nelson testified that Petitioner went on to explain, in colorful language, that Lewis had called the landlord and gotten Petitioner's truck towed, and that Lewis and Hall would not have told the landlord about his truck if Lewis could parallel park. Nelson stated that while Petitioner was explaining the situation, he kept yelling at people in the area. Nelson testified that after he made several attempts to get Petitioner to stop yelling, he arrested Petitioner and charged him with disorderly conduct. Nelson testified that Petitioner said that he, Petitioner, needed to get his gun and shoot Lewis and Hall. Nelson recounted that Petitioner made a gesture with his hands as if pulling back the slide on a semi-automatic weapon. He reported that Petitioner said several times that the police should arrest Lewis "because that bitch can't parallel park." Nelson testified that Petitioner made bond, and that police were again dispatched to the apartment complex about an hour later to respond to a report that shots were fired.

Nelson testified that when he returned to the apartment complex and went to Petitioner's apartment with Officer Brewer, Petitioner, still irate, opened the door and was arrested. Nelson stated that he, too, noticed a nine millimeter shell casing outside of Petitioner's door upon the officers' approach to Petitioner's apartment. Petitioner was put in the back of a patrol car in front of the apartment complex. Nelson recounted that he asked Petitioner about the location of the gun, and that Petitioner initially denied having a gun. He stated that Petitioner eventually told

him, incorrectly, that the gun was in Petitioner's truck. Nelson took Petitioner to the police station.

At trial, the defense stipulated that Petitioner had previously been convicted of the crime of murder in the Circuit Court of Jones County. *See Bennett v. State*, 374 So. 2d 803 (Miss. 1979). Petitioner testified on his own behalf. He testified that he woke up on April 6, 2005, with a hangover, and that he took some pain medication, which he happened to have available because he had lost the index finger on his right hand. Petitioner stated that he had spent the morning sorting clothes and going through some paperwork he intended to file in Justice Court. Then, he stated, he decided to take his garbage out and put his welding gear in the back of his truck. Petitioner admitted that there was conflict between Hall, Lewis, and himself. Petitioner stated that he had to pass by Hall's apartment in order to get to the garbage container, and that as he did not want a confrontation with Hall, he just decided to put the garbage in the back of his truck.

Petitioner testified that as he was putting the garbage in his truck, Hall said, "You need to go ahead and junk that old piece of junk." Petitioner, offended, responded, "Man, you need to go ahead and leave me alone, man. I just want you to teach your skank ass bitch how to drive her car." Continuing, he also told Hall, "Why you wasting your time with me? Put your time to some value; teach her how to park."

Petitioner claimed that while he was saying this and fussing with his garbage, Hall started cursing him and came toward him while opening up a pocket knife. Petitioner testified that he was tired and was trying to get his garbage back into his apartment since it would not fit into the vehicle, but that Hall was cursing at him. Petitioner testified that he managed to get back into his apartment, and that Hall then kicked Petitioner's apartment door and kicked his vehicle.

6

Petitioner claimed that Hall was cursing and calling him names the entire time.

A short time later, the police showed up, and when the officers asked Petitioner what the problem was, Petitioner told them about his truck and the fact that Lewis "couldn't drive worth fifty cents." Petitioner was arrested and taken to jail. Petitioner stated that he probably could not have made the gun-slide hand motions Nelson testified to because he was handcuffed at the time. Petitioner stated that he made bond, and that when the bondsman took him home, Petitioner agreed to the bondsman's suggestion that Petitioner should just stay in his apartment. As soon as the bondsman left, however, Petitioner went to his aunt's house. He then went to Cecil's liquor store and got a half-pint of whiskey for two dollars. Petitioner testified that he drank about half of the whiskey at Cecil's before returning to his apartment.

Petitioner testified that when he got to his apartment, he saw Hall outside playing with a little girl. Petitioner opened the car door, put his liquor in his pocket, opened the glove compartment, took out his pistol, got out of the car, and put the pistol behind himself. Petitioner said he backed up behind the car so he could keep his eyes on Hall. Petitioner said Hall saw him and came toward him, opening up a pocket knife, talking crazy, cursing, and walking "gangster style." Petitioner testified that he walked toward his door and told Hall, "I just got out of jail. I don't want to go to jail again, man. Why don't you just leave me alone, man." Hall was said to have responded with profanity.

Petitioner testified that he got to his door but was struggling to open it, since he had lost an index finger and was having to keep an eye on Hall while also trying to keep a hand close to his gun. Petitioner testified that Hall leaped at him, and that Petitioner fired two shots at Hall. Petitioner testified that he thought Hall was going to seriously injure him. Petitioner stated that

he told Hall, "Get your dog ass out of my way." He stated that Hall, shaking and holding the wall, began to make his way back to his apartment. Petitioner testified that he retreated to his apartment, and that Nelson and the other officers showed up about ten to fifteen minutes later.

Petitioner testified that he was drunk and mad when he shot Hall and was not sure what he told the police about the shooting. He admitted that there were certain aspects of his testimony that he did not tell police. He stated that he may or may not have made the gun-sliding hand motions while being booked for disorderly conduct, but that he could not remember because he was drunk at the time. Petitioner stated that the State's witnesses who testified as to Hall's location when he was shot were wrong, as Petitioner could not see all the way to Hall's door. He later denied being drunk when law enforcement paid him the first visit on April 6, 2005, but he did admit that he was suffering a bad hangover at the time. Petitioner maintained that he shot Hall as Hall was rushing toward him armed with a knife.

The jury convicted Petitioner of aggravated assault (Count I) and possession of a firearm by a convicted felon (Count II) in the Circuit Court of Bolivar County, Mississippi. At sentencing, Petitioner told the trial court that he did not actually shoot Hall, but rather, "a young gangster thug." Petitioner admitted that he fired his weapon but claimed that he picked up the shells after the shooting. The trial judge sentenced Petitioner to serve twelve years for Count I and three years for Count II in the custody of the Mississippi Department of Corrections, with the sentences to run concurrently.

Petitioner, with the assistance of counsel from the Mississippi Office of Indigent Appeals, appealed his convictions and sentences, raising the following issue:

Issue 1. Whether the guilty verdict was against the overwhelming weight

8

of the evidence.  Self-defense.

On December 14, 2010, the Mississippi Court of Appeals affirmed the judgment of the

Circuit Court in a written opinion.  *Bennett v. State*, 50 So. 3d 369 (Miss. Ct. App. 2010) (Cause

No. 2006-KA-00054-COA); (Answer, Ex. A).   Petitioner filed a "Motion for Enlargement of

Time Within Which to File a Pro se Motion for Rehearing" on December 29, 2010, but no

motion for rehearing was filed in the case.

On September 16, 2011, Petitioner filed in the Mississippi Supreme Court an application

to proceed in the trial court with a motion for post-conviction relief, raising the following issues

*pro se*:

| | |
|---|---|
| Issue One. | Petitioner was denied his sixth and fourteenth amendment rights to effective assistance of trial and appellate counsel. |
| Issue Two. | Petitioner was denied his sixth and fourteen amendment rights and equal protection of the laws where the jury venire did not represent a fair cross section of the community. |
| Issue Three. | Petitioner was denied his sixth and fourteenth amendment rights to a fair trial where the trial judge was biased. |
| Issue Four. | Petitioner was denied due process where the record for appeal is incomplete. |

On November 9, 2011, the Mississippi Supreme Court filed an order denying the application.

(Answer, Ex. B; *see also* Miscellaneous Pleadings, Cause No. 2009-M-01225).

In this petition for writ of habeas corpus, Petitioner raises the following issues, *pro se*:

| | |
|---|---|
| Ground One. | The guilty verdict is against the overwhelming weight of the evidence, which leads petitioner being held in custody in violation of his fifth amendment right to due process. |
| Ground Two. | Petitioner was denied his sixth and fourteenth amendment rights to effective assistance of trial and appellate counsel.<br>A.  Counsel was deficient in failing to preserve the record.<br>B.  Counsel's failure to assure petitioner was tried before an unbiased and impartial decision-maker was deficient and |

prejudicial to petitioner's fourteenth amendment constitutional right.

C.  Counsel failed to conduct any pre-trial investigation and/or produce witnesses.

D.  Counsel failed to object where the state introduced tainted and/or illegally received evidence at trial without objection thereto.

E.  Counsel failed to hire an expert to challenge the validity of the evidence admitted by the state, specifically the shell casing and the gun.

F.  Counsel failed to object when state witnesses testified without being put under oath and/or take the oath to testify truthfully.

G.  Counsel failed to meaningfully cross-examine state witnesses and/or put the state's case through any adversarial testing.

H.  Counsel failed to object when the court, in front of the jury, told the alternate jurors that the court would conduct its own deliberations with them.

I.  Counsel failed to object to the admission of other bad acts evidence elicited throughout trial by the prosecutor.

Ground Three.  Petitioner was denied his sixth and fourteenth amendment rights and equal protection of the laws where the jury verdict did not represent a fair cross section of the community.

Ground Four.  Petitioner was denied his Sixth and Fourteenth Amendment rights to a fair trial where the trial judge was biased.

Ground Five.  Petitioner was denied due process where the record for appeal is incomplete**.**

**Legal Standard**

The Court's review of Petitioner's claims is governed by the Antiterrorism and Effective Death Penalty Act of 1996 ("AEDPA"), because his federal habeas petition was filed after the statute's effective date.  *See Lindh v. Murphy*, 521 U.S. 320 (1997).  The AEDPA prohibits the grant of federal habeas relief on any claim adjudicated on the merits in state court unless that adjudication (1) resulted in a decision that was contrary to, or involved an unreasonable application of, clearly established United States Supreme Court precedent; or (2) resulted in a decision that was based on an unreasonable determination of the facts in light of the presented

evidence.  *See* 28 U.S.C. § 2254(d)(1) & (2); *Schriro v. Landrigan*, 550 U.S. 465, 473 (2007).

A state court's decision is "contrary to" Supreme Court law if (1) "the state court applies a rule that contradicts the governing law set forth in [Supreme Court] cases," or (2) "if the state court confronts a set of facts that are materially indistinguishable from a decision of [the Supreme] Court and nevertheless arrives at a result different from [its] precedent."  *Williams v. Taylor*, 529 U.S. 362, 405-06 (2000).  The "unreasonable application" clause is reserved for decisions that either fail to identify the correct governing law, or that identify the correct governing law but misapply it to the case.  *Id.* at 407-08.  Under this standard, a state court's decision will not warrant federal habeas relief unless its application of federal law is both incorrect and unreasonable.  *Garcia v. Dretke*, 388 F.3d 496, 500 (5th Cir. 2004) (citation omitted).  A federal habeas court considers only the state court's conclusion when determining whether there has been an unreasonable application of federal law, and not the court's reasoning in reaching the decision.  *Neal v. Puckett*, 286 F.3d 230, 246 (5th Cir. 2002).

## Discussion

### Ground One.  Verdict against the weight of the evidence.

Petitioner claims that the guilty verdict in his case is against the overwhelming weight of the evidence.  On direct appeal, Petitioner presented a claim that his guilty verdict is against the weight of the evidence.  He did not, however, file a motion for rehearing from the decision of the Mississippi Court of Appeals.  Because he did not timely file a motion for rehearing from the appellate court's decision, Petitioner forfeited his opportunity to seek certiorari review in the State's highest court, the Mississippi Supreme Court.  *See* Mississippi Rule of Appellate Procedure 40 (allowing a petitioner to file a motion for rehearing within fourteen days following

11

a decision by the Mississippi Supreme Court or Mississippi Court of Appeals); Mississippi Rule of Appellate Procedure 17 (allowing a petitioner seeking review of a Mississippi Court of Appeals decision denying rehearing fourteen days following entry of judgment on the motion for rehearing to petition the Mississippi Supreme Court for a writ of certiorari).

Because Petitioner did not present this claim to the State's highest court in a procedurally proper manner, he has failed to properly exhaust his State court remedies as is required by 28 U.S.C. § 2254(c). *See O'Sullivan v. Boerckel*, 526 U.S. 838, 839-40 (1999) (holding that a state prisoner must present his claims to a state supreme court in a petition for discretionary review in order to satisfy the exhaustion requirement). Petitioner chose not to raise this claim in his *pro se* motion for post-conviction collateral relief, so he no longer has an available avenue through which to properly present this claim to the State's highest court. As such, his claim is procedurally barred. *Finley v. Johnson*, 243 F.3d 215, 220 (5th Cir. 2001) ("If a petitioner fails to exhaust state remedies, but the court to which he would be required to return to meet the exhaustion requirement would now find the claims procedurally barred, then there has been a procedural default for purposes of federal habeas corpus relief."); *Sones v. Hargett*, 61 F.3d 410, 416 (5th Cir. 1995) (holding that when "it is obvious that the unexhausted claim would be procedurally barred in state court, we will forego the needless 'judicial ping-pong' and hold the claim procedurally barred from habeas review").

Therefore, in order to obtain habeas review of his defaulted claim, Petitioner must demonstrate cause for the default and actual prejudice as a result, or that failure to consider the claim would result in a fundamental miscarriage of justice. *Coleman v. Thompson*, 501 U.S. 722, 750 (1991). "Cause" in this context is something external to the petitioner that cannot be fairly

attributed to him. *Id*. at 753. While attorney error may constitute "cause" in some instances, attorney error that is not constitutionally ineffective will not excuse a procedural default. *Murray v. Carrier*, 477 U.S. 478, 488 (1986). Moreover, the right of counsel does not carry over to discretionary appeals from an intermediate appellate court to a state supreme court. *See, e.g., Jackson v. Johnson,* 217 F.3d 360, 365 (5th Cir. 2000) (holding that "a criminal defendant has no constitutional right to counsel on matters related to filing a motion for rehearing following the disposition of his case on direct appeal"); *Moore v. Cockrell*, 313 F.3d 880, 882 (5th Cir. 2002) (citing *Ross v. Moffitt*, 417 U.S. 600, 619 (1974) for the proposition that there is no right to counsel for discretionary reviews in state court). Accordingly, counsel's failure to advise Petitioner as to the possibility of rehearing or certiorari review does not constitute cause for the default. Because Petitioner fails to demonstrate cause, the Court need not question whether there is prejudice. *See Martin v. Maxey*, 98 F.3d 844, 849 (5th Cir. 1996).

Neither does Petitioner establish that failure to consider his claim would result in a fundamental miscarriage of justice. The "fundamental miscarriage of justice" exception is confined to cases of actual innocence where the petitioner shows, as a factual matter, that he did not commit the crime of conviction. *Fairman v. Anderson*, 188 F.3d 635, 644 (5th Cir. 1999) (citation and internal quotation marks omitted). A petitioner claiming this exception must present new, reliable evidence and show that it was "more likely than not that no reasonable juror would have convicted him in light of the new evidence." *Id.* (citation omitted). Petitioner has not identified any new, reliable evidence to support his claim. Therefore, this ground for relief is procedurally defaulted for purposes of federal habeas review.

**Ground Two. Ineffective Assistance of Counsel**

Petitioner raises several claims challenging the adequacy of his defense. The Sixth Amendment to the United States Constitution guarantees a criminal defendant the right to the effective assistance of counsel. *See, e.g.,Yarborough v. Gentry*, 540 U.S. 1, 5 (2003). A federal habeas petitioner's claim that he was denied the effective assistance of counsel at trial is generally measured by the two-pronged test set forth in *Strickland v. Washington*, 466 U.S. 668 (1984). To prevail on a claim of ineffective assistance of counsel, Petitioner must establish that (1) his trial counsel's performance was so deficient that it cannot be said that he was functioning as "counsel" within the meaning of the Sixth Amendment, and (2) the deficient performance prejudiced his defense. *See id.* at 687; s*ee also Boyle v. Johnson*, 93 F.3d 180, 187 (5th Cir. 1996) (finding that ineffective assistance of counsel claims are analyzed under the *Strickland* framework). A petitioner satisfies *Strickland*'s prejudice prong by demonstrating that "there is a reasonable probability that, but for counsel's unprofessional errors, the result of the proceeding would have been different. A reasonable probability is a probability sufficient to undermine confidence in the outcome." *Strickland*, 466 U.S. at 694.

The failure to prove either deficient performance by counsel or actual prejudice as a result of counsel's actions or omissions defeats a claim of ineffective assistance. *See id.* at 687; *Green v. Johnson*, 160 F.3d 1029, 1035 (5th Cir. 1998). In a case where the state court has rejected the merits of a petitioner's ineffectiveness claim, the "pivotal question" in a federal habeas proceeding "is whether the state court's application of the *Strickland* standard was unreasonable." *Harrington v. Richter*, ___ U.S. ___, 131 S. Ct. 770, 785 (2011).

**A.  Failure to preserve the appellate record.**

Petitioner alleges that his trial counsel was deficient in failing to preserve the appellate

record. He claims that the record is incomplete, as it does not include what took place during jury selection. Further, he argues that opening arguments and the testimony of Officer Peterson are not in the record.

The Mississippi Rules of Appellate Procedure state that jury voir dire is not included in the record unless specifically designated. *See* Miss. R. App. P. 10(b). Petitioner offers no proof that jurors were improperly selected in this case. The Court notes that there is no record that an Officer Peterson testified at Petitioner's trial. Additionally, Petitioner does not give any information about how the inclusion of the opening arguments would help his case or cast doubt on his conviction. "[M]ere conclusory allegations do not raise a constitutional issue in a habeas proceeding. *Schlang v. Heard*, 691 F.2d 796, 798 (5th Cir. 1982) (collecting cases)." *Ross v. Estelle*, 694 F.2d 1008, 1012 (5th Cir. 1983). Petitioner is not entitled to habeas relief on this claim.

**B. Failure to ensure unbiased jury.**

Petitioner argues that his attorney was ineffective in failing to challenge the jury composition at Petitioner's trial, as it did not represent a fair cross-section of the community. Petitioner alleges that there were only sixteen men in the forty-nine member venire, and that only one male sat on the jury that heard his case. (ECF No. 3, 56-58).

Petitioner argues that his jury was composed mostly of women, and that this shows that there was gender discrimination during jury selection. He argues that the prosecutor was a woman, and he seems to theorize that she purposefully struck the men in the jury pool. He faults counsel for not preserving the record for appeal. However, attorneys' decisions during voir dire are considered a matter of trial strategy. *Teague v. Scott*, 60 F.3d 1167, 1172 (5th Cir. 1995). A

decision concerning trial tactics cannot be the basis for a claim of ineffective assistance of counsel unless counsel's tactics are shown to be "so ill chosen that it permeates the entire trial with obvious unfairness." *Id.* (quoting *Garland v. Maggio*, 717 F.2d 199, 206 (5th Cir. 1983)).

Petitioner cannot show he was convicted by an improperly selected jury, or that any male jurors were struck on the basis of gender. Petitioner cannot meet either prong of *Strickland*. Accordingly, the Mississippi Supreme Court's decision rejecting this claim is neither contrary to, nor does it involve an unreasonable application of, *Strickland*.

## C. Failure to investigate, produce witnesses, and put the State's case to adversarial testing.

An attorney is charged with investigating and preparing to present "an intelligent and knowledgeable defense." *Caraway v. Beto*, 421 F.2d 636, 637-38 (5th Cir. 1970). An attorney's "strategic choices made after thorough investigation of law and facts relevant to plausible options are virtually unchallengeable; and strategic choices made after less than complete investigation are reasonable precisely to the extent that reasonable professional judgments support the limitations on investigation." *Strickland*, 466 U.S. at 690-91.

The Supreme Court has held that "if counsel entirely fails to subject the prosecution's case to meaningful adversarial testing, then there has been a denial of Sixth Amendment rights that makes the adversary process itself presumptively unreliable." *United States v. Cronic*, 466 U.S. 648, 659 (1984). In a footnote, the Court in *Chronic* noted that "[a]part from circumstances of that magnitude, however, there is generally no basis for finding a Sixth Amendment violation unless the accused can show how specific errors of counsel undermined the reliability of the finding of guilt." *Id.* at n.26.

The record shows that defense counsel fully participated in cross-examining witnesses

and attempting to highlight reasonable doubt in the face of substantial evidence of Petitioner's guilt. Petitioner cannot show that the finding of guilt was unreliable because of his attorney's actions.

The Court otherwise notes that "counsel's decisions regarding examination and presentation of witnesses and testimony. . . fall within [the] category of trial strategy[,] which enjoys a strong presumption of effectiveness." *Pape v. Thaler*, 645 F.3d 281, 291 (5th Cir. 2011). The United States Court of Appeals for the Fifth Circuit has held:

> Complaints of uncalled witnesses are not favored in federal habeas corpus review because allegations of what a witness would have testified are largely speculative. Where the only evidence of a missing witnesses' testimony is from the defendant, this Court views claims of ineffective assistance with great caution.

*Sayre v. Anderson*, 238 F.3d 631, 635-36 (5th Cir. 2001) (internal citation and citations omitted). In order to establish ineffective assistance based on counsel's failure to call a witness, a petitioner is required to "demonstrate that the witness was available to testify and would have done so, set out the content of the witness's proposed testimony, and show that the testimony would have been favorable to a particular defense." *Day v. Quarterman*, 566 F.3d 527, 538 (5th Cir. 2009). Here, the jury heard from Petitioner his version of the shooting and chose to convict. Counsel has not been shown deficient for failing to investigate further or offer any additional testimony. Further, Petitioner has not argued how this allegedly deficient behavior prejudiced his trial. The Court finds that the decision rejecting this claim is neither contrary to, nor does it involve an unreasonable application of, *Strickland*.

**D. Failure to hire expert.**

Petitioner argues that trial counsel should have hired an expert to challenge the validity of

the shell casing and the gun admitted by the State at trial, and that the decision not to do so was ineffective assistance of counsel. As Petitioner testified to shooting Hall, however, any additional testimony by an expert concerning the gun would not help cast doubt on Petitioner's conviction. As Petitioner notes, the defense attorney did attempt to keep the shell casing from being admitted into evidence, but the objection was overruled by the trial court. (Trial Tr. vol. 2, 37-39). Counsel was not deficient in failing to call an expert in this case, and Petitioner cannot show prejudice as a result of counsel's decision. The Court finds that the decision rejecting this claim is neither contrary to, nor does it involve an unreasonable application of, *Strickland*.

**E. Failure to object.**

Petitioner claims that trial counsel was ineffective in failing to object: (1) when the state witness testified without being put under oath; (2) when the state introduced tainted and/or illegally received evidence at trial; (3) when the court, in front of the jury, told the alternate jurors that the court would conduct its own deliberations with them; and (4) to the admission of other bad acts evidence elicited through the prosecutor.

Petitioner has not shown any deficiency on the part of his attorney, as the record shows that the objections he claims his attorney should have made are without merit. Failing "to raise meritless objections is not ineffective lawyering, it is the very opposite." *Clark v. Collins*, 19 F.3d 959, 966 (5th Cir. 1994).

The Court notes that the two-pronged *Strickland* test is likewise applicable to the review of appellate counsel's performance. *Evitts v. Lucey*, 469 U.S. 387, 397-99 (1985). The Supreme Court has held, however, that appellate counsel does not have a duty to raise every "colorable" claim on appeal. *Jones v. Barnes*, 463 U.S. 745, 751-54 (1985). In this case, Petitioner's

appellate attorney filed a well-prepared brief on behalf of Petitioner wherein he challenged the weight of the evidence, and Petitioner cannot demonstrate any deficiency on the part of his appellate attorney, or any prejudice resulting from his actions.

Petitioner fails to show any deficient actions or omissions by counsel, and he fails to establish a reasonable probability that, but for counsel's alleged errors, the result of the proceedings would have been different. The decision rejecting Petitioner's claims of ineffective assistance is neither contrary to, nor does it involve an unreasonable application of, *Strickland*.

## Ground Three. Jury venire.

Petitioner claims that he was denied his constitutional rights where his jury venire did not represent a fair cross-section of the community, as the majority of the people on the jury were women.

Petitioner has not identified any particular procedure or selection criteria used in Bolivar County that would exclude males from his jury pool as is required to support his claim. *See, e.g., Berghuis v. Smith*, 559 U.S. 314, 327 (2010) (holding that, in order to establish a *prima facie* violation of the fair-cross section requirement, a defendant must prove that a distinctive group is not fairly and reasonably represented in jury venires because of systematic exclusion in the jury-selection process). Moreover, Petitioner offers no proof that the jurors in his case were chosen or struck based on their gender. The fact that the jury seated in this case was composed primarily of women does not prove that the prosecutor discriminated against men during the selection process. *See J.E.B. v. Alabama ex rel. T.B.*, 511 U.S. 127, 143 (1994) (holding that gender discrimination in the exercise of peremptory challenges is unconstitutional). The Mississippi Supreme Court held this issue without merit without remanding the case to the trial court for an

evidentiary hearing or an expansion of the record. Petitioner cannot demonstrate that the

determination that this claim lacked merit is contrary to, or that it involves an unreasonable

application of, clearly established federal law, and he has not demonstrated that the decision is

based on an unreasonable determination of facts in light of the evidence presented.

**Ground Four. Biased Judge.**

Petitioner argues that he was denied a fair trial because the trial judge was biased. He

alleges that the trial judge "abused his position in seating alternate jurors, conducting trial against

court procedures where state witnesses did not have to take oath before testifying and held

separate deliberations with the alternate jurors where the judge admitted he was happy the jury

returned a guilty verdict." (ECF No. 1, 9).

Federal habeas relief is granted only to remedy violations of federal law; mere violations

of state law will not suffice. 28 U.S.C. § 2254; *Engle v. Isaac*, 456 U.S. 107, 119 (1983). A

federal court does not have jurisdiction to determine a petitioner's rights under "state recusal

statutes or ethical canons as such." *Richardson v. Quarterman*, 537 F.3d 466, 474 (5th Cir.

2008). Regarding claims of judicial bias, the Fifth Circuit Court of Appeals has noted that the

United States Supreme Court "has recognized two kinds of judicial bias: actual bias and

presumptive bias." *Bunton v. Quarterman*, 524 F.3d 664, 672 (5th Cir. 2008). It further noted:

> There are three situations in which the Supreme Court has found presumptive bias:
> (1) the decision maker has a direct personal, substantial, and pecuniary interest in
> the outcome of the case; (2) an adjudicator has been the target of personal abuse
> or criticism from the party before him; and (3) a judicial or quasi judicial decision
> maker has the dual role of investigate and adjudicating disputes and complaints.

*Id.* Petitioner cannot show presumptive bias in this case; therefore, he must show actual bias. *Id.*

at 673. Nothing in the record reflects any circumstances from which the Court could infer that

Petitioner's trial judge was biased. "[M]ere conclusory allegations do not raise a constitutional

issue in a habeas proceeding. *Schlang v. Heard*, 691 F.2d 796, 798 (5th Cir. 1982) (collecting cases)." *Ross v. Estelle*, 694 F.2d 1008, 1012 (5th Cir. 1983). Accordingly, the decision rejecting this claim is not contrary to, nor does it involve an unreasonable application of, clearly established federal law, and it is not based on an unreasonable determination of facts in light of the evidence presented.

### Ground Five. Incomplete appeal record.

Petitioner alleges that he was denied due process because the record for appeal is incomplete. Mississippi Rule of Appellate Procedure 10(b) states that jury voir dire shall not be included in the record unless specifically designated. Petitioner has not shown that this rule violates any constitutional requirements. Therefore, Petitioner cannot show that the decision rejecting this claim is contrary to, or that it involves an unreasonable application of, clearly established law.

### Certificate of Appealability

Petitioner must obtain a certificate of appealability ("COA") before appealing this Court's decision denying federal habeas relief. 28 U.S.C. § 2253(c)(1). A COA will not issue unless Petitioner makes "a substantial showing of the denial of a constitutional right." 28 U.S.C. § 2253(c)(2). To obtain a COA on any claim rejected on its merits, Petitioner must demonstrate that "reasonable jurists would find the district court's assessment of the constitutional claims debatable or wrong." *Slack v. McDaniel*, 529 U.S. 473, 484 (2000). To obtain a COA on a claim that has been rejected on procedural grounds, Petitioner must demonstrate "that jurists of reason would find it debatable whether the petition states a valid claim of the denial of a constitutional right and that jurists of reason would find it debatable whether the district court was correct in its procedural ruling." *Id.* Applying these standards, the Court concludes that a COA should be

denied.

<h2 style="text-align:center">Conclusion</h2>

It is hereby ordered that Petitioner's petition for a writ of habeas corpus is **DENIED**, and that this action is **DISMISSED WITH PREJUDICE**. A certificate of appealability is **DENIED**. All pending motions are **DISMISSED AS MOOT**. A final judgment in accordance with this opinion and order will issue today.

**SO ORDERED, THIS** the 9th day of July, 2014.

**/s/ Michael P. Mills**
**MICHAEL P. MILLS**
**U.S. DISTRICT JUDGE**